UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SWANSON GROUP MFG. LLC**, 2695 Glendale Valley Rd., Glendale, OR 97442; **ROUGH & READY LUMBER LLC**, 30365 Redwood Hwy, Cave Junction, OR 97523; **SENECA SAWMILL COMPANY,** 90201 Hwy 99, Eugene, OR 97402; **SENECA JONES TIMBER CO.**,  90201 Hwy 99, Eugene, OR 97402; **SCOTT KEEP**, 90201 Hwy 99, Eugene, OR 97402; **FRERES LUMBER CO. INC**, P.O. Box 276, Lyons, OR 97358; **ROBERT T. FRERES, JR.** P.O. Box 276, Lyons, OR 97358; **HULL-OAKES LUMBER CO.**, P.O. Box 40, Monroe, OR 97456; **STARFIRE LUMBER CO., INC.**, P.O. Box 547, Cottage Grove, OR 97424; **C & D LUMBER CO.**, 1182 Pruner Rd, Riddle, OR 97469; **SOUTH COAST LUMBER CO.**, 885 Railroad St., Brookings, OR  97415; **BOISE CASCADE WOOD PRODUCTS, LLC**, 3285 N Pacific Hwy, Medford, OR 97501; **ROBERT E. RAGON**, 3000 Stewart Parkway, Suite 208, Roseburg, OR 97470; **AMERICAN FOREST RESOURCE COUNCIL,** 5100 SW Macadam Ave., Ste. 350, Portland, OR 97239; **DOUGLAS TIMBER OPERATORS, INC.**, 3000 Stewart Parkway, Suite 208, Roseburg, OR 97470; Plaintiffs, v. **S.M.R. JEWELL**, Secretary of Interior, 1849 C Street, NW, Washington, D.C. 20240, and **TOM VILSACK**, Secretary of Agriculture,1400 Independence Ave., SW Washington, DC 20250, Defendants | Civil No. Action for Declaratory and Injunctive Relief to Remedy Violations of the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937, 43 U.S.C. § 1181a; and the Administrative Procedure Act, 5 U.S.C. §§ 551-706 **COMPLAINT** |

For their complaint herein, plaintiffs allege as follows:

## INTRODUCTION

1.  This is an action against the Hon. S.M.R. Jewell, in her official capacity as Secretary of Interior, and the Hon. Tom Vilsack, in his official capacity as Secretary of Agriculture, for declaratory and injunctive relief to remedy violations of the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 (O&C Act), 43 U.S.C. § 1181a, and the Administrative Procedure Act (APA), 5 U.S.C.§§ 551-706, by the Bureau of Land Management (BLM), the U.S. Fish and Wildlife Service (FWS) and the U.S. Forest Service (USFS) relating to resource management and wildlife conservation in Washington, Oregon and California.  The First, Second and Third Claims in this case are based on the First, Second and Third Claims in *Swanson Group Mfg., LLC v. Salazar*, No. 10-1843 (D.D.C.).  The Fourth Claim in this case is based on the Claim in *Swanson Group Mfg., LLC v. Jewell*, No. 14-211 (D.D.C.).

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief) and 2202 (injunctive relief).  Plaintiffs have challenged final agency action as defined by the APA, 5 U.S.C. § 704.  Venue in this district is proper under 28 U.S.C. § 1391(e) because the challenged decisions and failures originated in this district, the events or omissions giving rise to the claims occurred in this district, and the defendants reside in this district.

## PARTIES

3.  Plaintiff Swanson Group Mfg. LLC (Swanson) is a family-owned enterprise that operates forest product manufacturing facilities in Glendale, Roseburg, Springfield and Noti, Oregon and employs over 600 workers at its sawmills and related operations.  Swanson is one of the largest purchasers of timber sales offered by the BLM in Oregon.  At the current time Swanson processes 182 million board feet of timber in a year at its manufacturing facilities, producing wood products

Page 2 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

sold to customers throughout the United States. Swanson has no trouble selling all the wood products it currently produces. Swanson has the capacity to process an additional 58 million board feet of timber in a year by running additional shifts at its mills. If Swanson could produce more wood products the company would easily be able to sell those products into the open market and increase its profitability. Swanson is a member of the American Forest Resource Council and Douglas Timber Operators.

4. Swanson owns virtually no private timber land. For its supply of raw materials to operate its business, Swanson relies on BLM timber provided by the Medford, Roseburg, Coos Bay, Eugene and Salem districts, on USFS timber from the Rogue-Siskiyou, Umpqua, Willamette and Siuslaw National Forests, on timber supplied by the State of Oregon and on timber supplied by private timberland owners. Swanson is currently unable to purchase additional timber for processing beyond the 182 million board feet per year it now processes.

5. The Forest Service is not capable of selling more timber than it currently does. Each national forest has an allowable annual sale quantity of timber set in its land and resource management plan, and it cannot exceed that volume of timber in a year. The Forest Service cannot reach its allowable sale quantity on any of its national forests in Oregon due to a combination of budget constraints, personnel limitations, Endangered Species Act consultations, restrictions in the Northwest Forest Plan (which governs all the national forests in western Oregon) and citizen appeals and litigation of planned timber sales. There is no reasonable possibility the Forest Service can increase its annual timber sales beyond the level it currently sells.

6. The State of Oregon only owns a small amount of commercial forest lands, and offers a very small annual sale program each year. The Oregon state sale trend is down due to new management constraints and litigation, and Oregon is contemplating selling some of its state-owned timberlands to private interests. There is no plausible chance Oregon state lands will increase their

Page 3 - Complaint

annual timber sales beyond the current level.

7. Swanson currently purchases over 130 million board feet per year of private timber. Swanson is one of the largest purchasers of private timber in the state of Oregon. Virtually all of the companies it buys timber from manage their lands on a long-term sustained-yield basis, which means these companies do not have the capacity to increase their annual sales above current levels. These timber sellers are free to sell timber to whomever they choose, including foreign buyers such as China, or not to sell timber. Most of Swanson's private timber purchases are on the "spot" market, based on currently available logs. Swanson cannot rely on unpredictable future private timber sale levels to expand its operations.

8. The BLM's western Oregon O&C districts are the only timber sellers that have the capacity to increase timber sales that Swanson might be able to purchase at competitive auction. Those districts can sell more timber if ordered to do so because that is what has happened in the Medford and Roseburg Districts since 2013 when the court in *Swanson Group v. Salazar*, No. 10-1843 (D.D.C.) ordered the BLM to sell or offer for sale the allowable sale quantity (ASQ) declared in its resource management plans (RMPs) for the Medford and Roseburg districts. In response to the court's order, the BLM significantly increased its timber sale program for Fiscal Years 2014 and 2015 in the Medford and Roseburg districts. Swanson purchased the Rockstar Salvage sale in FY 2014 on the Medford district, containing over 12 million board feet of timber, for $1,180,205.40 (more than $220,000 over the appraised price) and will be injured if it is denied the opportunity to bid on and attempt to purchase additional sales in future auctions.

9. Not all BLM timber sales are equally reliable as the basis for adding shifts and employees. The O&C Act requires the BLM to sell or offer for sale the allowable sale quantity declared in each of its O&C districts' resource management plans. These sales, known as ASQ sales, must come from areas of O&C land designated for sustained-yield timber production, must be sold or offered every

Page 4 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347   ●   E-mail: markrutzick@rutzick.com

year, and are therefore reliable as a basis for adding a shift and new employees. The BLM also offers "non-ASQ" sales involving commercial thinning of reserved areas where no sustained-yield timber production is permitted, but these sales are not reliable as a basis for adding a shift and new employees because there is no statutory requirement for BLM to offer the same amount, or any amount, of these sales each year.

10. Swanson's inability to secure additional long-term timber supplies necessary to add shifts to its mills is occurring at the present time and currently deprives Swanson of the additional profits that would be generated by adding an additional shift and processing more timber. For the same reason the lack of additional BLM timber sales also creates a substantial probability of imminent future injury to Swanson.

11. Rough & Ready Lumber LLC (Rough & Ready) is a family-owned business which has been in operation continuously for more than 90 years except for 13 months from June 2013 to July 2014. Rough & Ready is a member of the American Forest Resource Council.

12. Rough & Ready occupies a particular niche in the lumber manufacturing world that differs from other western lumber producers. The company processes Ponderosa Pine and Sugar Pine logs into products that it sells primarily to the major window and door manufacturers of the United States (*e.g.*, Andersen, Pella) for remanufacture into windows and doors. The company also processes Douglas Fir logs into dimension lumber, timbers and specialty cuttings on a custom basis for its customers. Rough & Ready has longstanding relationships with its major customers, and can reliably sell all the products it produces. Lack of demand is not and never was a limitation on Rough & Ready's profitability.

13. In the period before the northern spotted owl was listed as a threatened species in 1990, Rough & Ready was almost entirely dependent on federal timber for its log supply: about one-third from the BLM Medford district and two-thirds from the Forest Service. The company then operated

Page 5 - Complaint

two mills:  a medium-diameter mill that could cut logs from 16 inches to 40 inches in diameter, and a small log mill that cut smaller sized logs. In the pre-owl period and for several years thereafter, the company employed about 225 workers running three shifts, and processed about four million board feet of timber per month, equal to about 50 million board feet per year. However, when the federal timber cutbacks began in 1994, the company could not obtain enough timber for three shifts, and it began to downsize, first cutting back to 175 employees, then 145 employees and by 2003 dropping to 88 employees. After 1994 the company began to put all of its resources into the medium-diameter mill, and stopped running the small log mill.  By 2013 the company was processing just 20 million board feet of timber per year in the medium-diameter mill.

14.  Rough & Ready is a certified small business under the rules established by the federal Small Business Administration (SBA). Both the BLM and the Forest Service by law operate a special program in which a certain percentage of their timber sales are set aside for certified small businesses, and larger companies are not allowed to bid.  As time passed after 1994 there were fewer and fewer remaining small businesses in the lumber manufacturing field, and Rough & Ready was increasingly one of the few remaining small businesses, giving it an excellent opportunity to purchase the small business SBA set-aside sales when they were offered. The opportunity to bid on SBA set-aside sales was a key component of the company's long-term survival.

15.  But the SBA set-aside program only works if the federal agencies offer timber sales, and the Northwest Forest Plan adopted in 1994 reduced Forest Service and BLM timber programs by more than 80 percent. While the Forest Service has never met its reduced allowable sale quantity on any national forest in western Oregon since 1994, the Forest Service does not have the same legal mandate to sell or offer to sell its allowable sale quantities from national forests as does the BLM under the O&C Act.  For a period of time the BLM was meeting its allowable sale quantity, but by the early 2000's the BLM Medford district began to miss its annual sale quantity by a large amount,

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347  ●  E-mail: markrutzick@rutzick.com

frequently selling less than half the sale quantity in a year due to a perpetually changing set of reasons. In addition, both agencies were increasingly offering thinning sales that had few of the larger diameter logs that Rough & Ready's mill required. By 2013 the company faced growing reductions in the BLM Medford district timber sale program, and no prospect for increased Forest Service sales. Even with the advantage of the SBA set-aside program, Rough & Ready faced a chronic shortage of larger diameter logs that the mill then required (the small log mill had been closed for a number of years and could not be reopened without major upgrades and maintenance that it could not afford at that time without a certain and dependable log supply). Rough & Ready therefore made the decision to close the company after more than 90 years in business. There was one reason and one reason only for that decision: lack of log supply, in particular the lack of log supply on the BLM Medford district coupled with the smaller diameter of the Forest Service sales that were being offered.

16. One key component in Rough & Ready's decision to close the mill was the loss of the Chew Choo timber sale in January 2012 due to BLM cancelling the sale after the company challenged BLM's failure to complete Endangered Species Act consultation on that sale. Rough & Ready had won the auction for Chew Choo in 2006, but the sale had never been awarded during six years of waiting. The Chew Choo sale contained 13 million board feet of timber, much of it larger diameter logs suited for Rough & Ready's mill, which would have met the mill's requirements for half a year or longer (the company would have sold or traded the smaller diameter logs to obtain additional larger diameter logs from other sources, if possible). The BLM did not offer the company any replacement timber for the cancelled sale, and none was available on the market throughout 2012 and 2013. Rough & Ready chose not to challenge the cancellation of the sale because under the deferential standard of judicial review applicable to agency decisions, it was unlikely to win the challenge. The loss of Chew Choo was a serious blow to its timber supply, and hastened its decision to close the mill.

Page 7 - Complaint

17.   In April 2013 Rough & Ready announced the impending closure of the Rough & Ready mill, and the mill closed in June 2013, requiring the lay-off of all 88 employees.

18. Subsequently to closure, the company learned about the federal New Market Tax Credit program, which is designed to provide financial support to businesses in economically deprived areas through the sale of tax credits. Josephine County, Oregon was such an economically deprived area, and Rough & Ready was qualified to participate in the New Market Tax Credit program. Through the sale of tax credits, it was able to finance the upgrading and automation of the small log mill so that it could process logs as small as eight inches in diameter, allowing use of the smaller logs that were primarily coming out of the few BLM timber sales that were being offered, as well as most of the Forest Service sales. The renovation of the small log mill also increased its capacity to 2.5 million board feet of timber per month, or 30 million board feet per year. In July 2013, after 13 months of closure, the company was able to reopen the mill, and today it employs 70 workers at the mill, compared to the 88 laid off in 2013. For the 13 month period from June 2013 to July 2014 the company processed no timber, sold no lumber and earned no profit, even though they had customers eager to purchase their products.

19.   The number one challenge for the company at this time remains log supply. Since July 2014 the company was able to purchase two BLM salvage sales with a combined total of around 10 million board feet, and it still owned remnants of BLM sales it had purchased before closure totaling around 5 million board feet. It was also able to purchase three Forest Service sales totaling around 13.5 million board feet. All of the BLM and Forest Service sales were SBA set-aside sales, and some of them have now been completed. To supplement federal timber supplies, Rough & Ready also purchases logs from private landowners in its area. However, the company faces strong competition for these logs from other companies in its area, and there simply is not enough private wood available to meet the needs of all the companies in the area that rely on that wood. Without a steady supply of

Page 8 - Complaint

BLM Medford district ASQ sales (the non-ASQ sales are not sufficiently reliable to serve as the basis for long-term timber supply) and Forest Service sales, Rough & Ready will not be able to maintain a sufficient log supply in the future. Since there no prospect for the Forest Service to increase timber sales, and no prospect for increased private wood sales, the BLM is the only log seller with the capacity to increase its timber sales to meet the local demand.  Rough & Ready needs more BLM timber sales each year to be able to survive, and the opportunity to bid on additional SBA set-aside sales is essential to its long-term future. Without an increase in future annual BLM ASQ timber sales, which will result in an increase in SBA set-aside sales, Rough & Ready faces a substantial probability of imminent financial harm due to the loss of the opportunity to bid on SBA set-aside sales.

20.  Rough & Ready's sister company Perpetua Forests Company owns around 20,000 acres of timberland, but most of that land is relatively far away from the Rough & Ready mill, with the result that Rough & Ready can obtain no more than about one million board feet of logs per year from Perpetua lands. Other available volume from the Perpetua lands is sold to other buyers with mills closer to the Perpetua lands, who can pay a higher price for the wood due to their proximity.

21.  Plaintiff Seneca Sawmill Company (Seneca) was founded by Aaron U. Jones in Eugene, Oregon in 1953 and continues to be owned by members of the Aaron U. Jones family.  Seneca is a leading innovator in lumber manufacturing, and Seneca holds over 25 U.S. and Canadian patents in various sawmill technologies.  Seneca manufactures 550 million board feet of studs and dimension lumber products annually from its manufacturing facilities in Eugene and Noti, Oregon, and sells everything it produces.  Seneca Sawmill currently employs about 420 workers, and is an SBA-qualified small business.  Seneca relies heavily on timber supplied by the Coos Bay, Eugene, Roseburg and Salem districts of the BLM and by nearby national forests, which complement the timber made available from Seneca's affiliate Seneca Jones Timber Company (Seneca Jones).  There is no prospect that the USFS can increase its timber sale volume, so BLM is the only seller capable of increasing its

Page 9 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347   ●   E-mail: markrutzick@rutzick.com

annual timber sale level.  Seneca is a member of AFRC.

22.  Seneca Jones owns approximately 167,000 acres of forestland in Lane, Douglas, Curry, Jackson, Linn, Benton, Coos and Josephine Counties, Oregon.  Seneca Jones manages its timberlands on a long-term sustained-yield basis.  Operating on a sustained yield basis, Seneca Jones timberlands can only supply about 28% of Seneca Sawmill's required timber needs.  Seneca Sawmill cannot maintain its current production level without a steady or increasing supply of federal timber.  Seneca Sawmill does not currently operate at capacity, and an additional timber supply will be needed to produce at capacity.  Lack of adequate timber supply will also increase the cost of logs, as it already has, causing financial harm to Seneca Sawmill.  Neither the Forest Service, Oregon state lands, Seneca Jones, other private landowners nor BLM non-ASQ timber sales can be relied on to supply more timber than their current sale level.  BLM ASQ sales are the only reliable source of additional timber that would allow increased production.  Seneca's inability to operate at full capacity has reduced and will continue to reduce the company's profitability.  Seneca has been injured by the denial of the opportunity to bid on the full supply of ASQ sales that are legally required to be offered each year, and faces the imminent threat of such future harm.

23.  The Seneca Jones timberlands include forestland that is both adjacent to, and, many times, intermingled with BLM land.  Seneca Jones' timberlands share a common boundary with BLM lands over a linear distance of 689 miles.

24.  Although the O&C Act requires BLM to manage all of its suitable timberlands for permanent forest production, for the past 20 years BLM has failed to do so over a majority of the O&C land it manages.  The BLM has managed less than 27% of its forested land base for permanent forest production under its 1995 RMPs, with the rest allocated to unlawful reserves where permanent forest production has been prohibited. This failure has resulted in neglect and mismanagement of adjoining O&C lands, creating hundreds of thousands of acres of forests with high fuel loads that

Page 10 - Complaint

increase the risk, spread and intensity of wildfire, and threaten Seneca Jones' forestland. Continued neglect and mismanagement of BLM lands is a direct, immediate and substantial threat to Seneca Sawmill's business and Seneca Jones' forest land. Seneca Jones relies on access to its own land through rights-of-way across BLM land. Loss of a BLM right-of-way road will cost Seneca Jones significant economic loss by preventing, or at least increasing the expense of, removal of Seneca Jones' timber from its own land, thereby reducing the profitability of any subsequent use of the timber and causing financial harm to Seneca Jones.

25. The risk of fire, disease or insect infestation starting on BLM lands and spreading to adjoining private land has increased substantially over the past 20 years, is substantial and will continue to increase as long as BLM fails to manage all of the O&C suitable forest lands for permanent forest production under the O&C Act. For Seneca Jones, this concern is not imaginary. In 2009, the Williams Creek Fire in Douglas County burned approximately 490 acres of Seneca Jones property in late July and early August. The fire started on federal land over two miles from Seneca Jones property in an area devoid of active management, including no maintained roads suitable for mechanized access. Although that particular fire started on Forest Service land, the Forest Service manages under the same lax management regime as BLM lands, i.e., the Northwest Forest Plan, and suffers from many of the same problems as BLM lands.

26. For the Williams Creek fire, lack of access to the burning area by mechanized transport created difficulty in firefighting efforts from the beginning of the fire throughout the life of the incident. Over the 16-day incident, access by ground personnel was a severely limiting factor in providing opportunity for control of the fire. Without access for facilitation of effective retreat for ground forces, safety concerns dictated an indirect attack method that utilized natural landscape features for controlling the perimeter location. Therefore, the Forest Service had to conduct a backburning of Seneca property on or near a ridgeline in three separate locations, with a total burned

Page 11 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

area of approximately 490 acres.  Backburning of Seneca property should not have been necessary because there is an intervening ridge of federal land between the area where the fire started and Seneca's property, which could have been used as the site for the backburn had proper access been available.  Unfortunately, the fire crews could not gain access to this ridge due to the Forest Service's failure to properly manage its land.  The fire crews could gain easy access to Seneca Jones land, so they had no choice but to use Seneca's land for the backburn.

27.  Seneca Jones' losses included Douglas-fir plantations ranging in age from four to 29 years, and many acres were 28-years old with a net value of $3,000 per acre.  Seneca has reestablished these plantations with an initial average cost of $600 per acre, and will incur further costs associated with fertilization and precommercial thinning. Had the Forest Service been actively managing the area adjacent to Seneca property, they would have been able to control the fire prior to its entering Seneca's land.

28.  Seneca Jones allows Seneca employees and the public to use its lands on a reservation basis.  Plaintiff Scott Keep is an employee of Seneca Sawmill who has used Seneca Jones land for hunting, fishing and camping, and intends to do so again in the near future.  His ability to use Seneca Jones land for recreation is substantially threatened by the risk of wildfire starting on BLM land and spreading onto Seneca Jones land, and that threat has substantially increased over the past 20 years due to the BLM's failure to sell or offer for sale its full allowable sale quantity of timber from its O&C districts.

29.  Plaintiff Freres Lumber Co. Inc. (Freres) is a family-owned small business that was founded in 1922.  Freres operates mills that manufacture softwood veneer, lumber and plywood.  The company is headquartered in Lyons, Oregon, 20 miles east of Salem, Oregon.  Freres is a member of AFRC.  Freres purchases federal timber from the BLM's Salem District and the Mt. Hood, Willamette, and Siuslaw National Forests.  Freres is the largest contract holder of BLM timber in the

Page 12 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

state of Oregon. The continued lack of BLM ASQ timber sales at the sustained yield level will severely hinder Freres' ability to maintain its operations.

30. Freres currently employs about 480 people, but at its peak capacity, it can employ as many as 499 workers. In the decade 1980-89, Freres processed approximately 50 million board feet of timber per year. Since the 1980's the company has invested heavily in new technology that has increased its capability to process timber. In the past decade alone Freres has invested over $65 million in new equipment and technology for its plants in order to modernize the mill and increase its capacity. Over the past decade Freres has processed on average (with considerable variation) about 78 million board feet of timber per year, and it is currently capable of processing 100 million board feet of timber per year if adequate timber supply were available. In 2011-13 Freres averaged 86 million board feet of timber processed in its mill and sold as finished wood products. Freres would increase its production to its 100 million board foot capacity, and hire additional employees to perform the work, if additional timber were available. Freres is a modern, efficient processor of timber, and with adequate timber supply it expects to continue indefinitely to provide wood products to its customers for use in building construction throughout the United States. Freres has no difficulty selling all of the forests products it manufactures.

31. In the decade 1980-89, almost 100 percent of Freres' timber supply came from federal forests and State of Oregon lands. About 75 percent of its timber supply (37.5 million board feet) was provided by the Forest Service, 15 percent (7.5 million board feet) by the BLM and 10 percent (5 million board feet) from Oregon state lands. Its current capacity is double the 1980's level, but since the 1980's the Forest Service and BLM timber sale programs have diminished to a small fraction of 1980's levels. In the 1980's western Oregon national forests sold over three billion board feet of timber per year, and the BLM sold over one billion board feet of timber per year. Today the Forest Service allowable sale level in western Oregon has been reduced to only about 350 million

Page 13 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347  ●  E-mail: markrutzick@rutzick.com

board feet of timber per year, and the BLM annual allowable sale level has been reduced to 203 million board feet.  The drop in Forest Service timber has been greatest, as Freres now obtains just 14 percent of its timber supply (12 million board feet) from the Forest Service.  Freres' BLM percentage of timber has dropped to 12 percent (10 million board feet), and Oregon state lands slightly increased to 12 percent (10 million board feet).    Its sister company Freres Timber owns 14,500 acres of timberland and another related entity, Freres Partnership LLC, owns 2,400 acres, but under the sustained-yield management that these companies practice, their lands (referred to jointly as Freres Lands) can supply only about 13 percent of Freres' annual timber requirement, and Freres is not able to increase the annual supply of timber from the Freres Lands without destroying their long-term productivity.

32.  When more BLM timber sales are available, Freres buys them.  In 2012 the BLM Salem District managed to sell more timber sales than usual (although many were non-ASQ sales that are less reliable than ASQ sales), and Freres responded by purchasing about 28 million board feet of BLM timber sales.  Freres now owns a total of 16 BLM timber sales.

33.  In addition to BLM timber sales, Freres acquires timber for its mills from the Mt. Hood, Siuslaw and Willamette National Forests, Oregon state forests and private timberland owners.  None of these sources has any prospect of supplying a steady and reliable increase in timber production that would allow Freres to expand its business.  The National Forests operate under the Northwest Forest Plan adopted in 1994, which is not scheduled to be revised in western Oregon for at least five more years.  Each national Forest has an annual allowable sale quantity of timber that it is not permitted to exceed.  The Forest Service rarely if ever achieves its allowable sale quantity, and there is no plausible likelihood the Forest Service will voluntarily or involuntarily increase timber sales from the

Page 14 - Complaint

Mt. Hood, Siuslaw or Willamette National Forests in the next five years or longer.  Oregon state forests also operate under a maximum permitted annual sale volume, and the State of Oregon has no plans to increase the permitted annual sale volume on its state forests in the foreseeable future. Oregon has taken initial steps to sell one of its premier timber-producing state forests due to the low sale volume it has achieved in recent years.

34.  Freres currently purchases about half its timber supply on the open market from other private companies, but these sales do not have the same value to Freres as BLM ASQ sales for several reasons.  First, these sales are solely at the discretion of the seller, and Freres has no contractual right to any steady supply of timber from any private company.  Any company could stop selling timber, or stop selling timber to Freres, at any time for any reason.  For these reasons, Freres does not rely on private timber purchases as a basis for expanding its production.  In contrast, a BLM timber sale contract generally allows three years for completion of the sale, so Freres can plan its operations with the certainty that the BLM logs will be available at the time of its choosing during the sale period.  In addition, the BLM has a legal obligation to sell its declared and determined allowable sale quantity each year, so Freres should be able to rely on a steady supply of BLM ASQ sales every year at the full allowable sale quantity.  While sales are all competitively bid, and Freres has no guarantee of being able to purchase any particular sale, there is a substantial probability that Freres could purchase some additional BLM timber sales if they are offered.  Freres has been injured, and faces imminent threat of future injury by BLM's failure to offer the full legally-required level of ASQ sales.  In addition, Freres is certified as a small business under Small Business Administration

Page 15 - Complaint

rules, and a certain percentage of BLM timber sales are set aside for bidding solely by certified small businesses like Freres, increasing its chances of successfully bidding on those sales. For these reasons, BLM's failure to offer the full allowable sale quantity of ASQ sales each year creates a substantial probability of imminent future injury to Freres through loss of the opportunity to bid on additional timber sales and to process 14 million board feet of timber into additional forest products to be sold this year and next year and the year after that, indefinitely. The non-ASQ sales offered by the BLM are not sufficiently reliable to serve as the basis for business expansion because there is no way to predict from year to year how many non-ASQ sales will be offered.

35. The BLM's continued failure to offer ASQ timber sales based on permanent forest production of all the suitable O&C timberlands in the BLM Salem district, and other districts, has also injured and imminently threatens to continue to injure Freres by making log prices higher than they otherwise would be (reducing the company's profit margin and total profit). If the BLM Salem district, and other BLM districts in Oregon, increased their annual timber sale volume to the level required by the O&C Act, it is very likely that log prices in western Oregon would decline across the board, which would add to Freres' profit margin and total profit. There is a substantial probability that BLM's on-going violations of the O&C Act will cause Freres to suffer imminent future financial loss from having to pay above-market prices for the logs its purchases, which reduces the profit margin and profitability of the wood products it sells.

36. The quality of wood on BLM timber sales is very high, which increases the profitability of the forest products produced from those sales. In addition, the BLM is required to offer its full

Page 16 - Complaint

allowable sale quantity of ASQ sales every year regardless of log prices, and federal timber may not lawfully be exported, eliminating China as a market factor, which tempers bidding prices for BLM sales.

37.   The Freres Lands share 36 miles of boundary with the BLM, and the Freres Lands are directly, immediately and substantially threatened with fire starting on poorly managed BLM lands and spreading uncontrollably onto the Freres Lands.

38.   Freres Timber Co. and Freres Partnership, LLC permit Freres employees and the public to have access to their land for the purposes of camping, hiking, fishing, hunting, swimming and firewood cutting.  Plaintiff Robert T. Freres, Jr. has hiked, fished and swum on the Freres Lands, and intends to do so again in the near future.  His ability to use the Freres Lands for hiking, fishing and swimming is directly and substantially threatened by the risk of fire starting on adjacent BLM land and spreading onto Freres Lands.  That risk has been substantially increased by BLM's failure to sell or offer for sale the full ASQ on its lands.

39.   Plaintiff Hull-Oakes Lumber Company (Hull-Oakes) is a family-owned small business located in Monroe, Oregon in the Oregon Coast Range.  Hull-Oakes is a member of AFRC.  Hull-Oakes has been in continuous operation under the same family management since 1937, and currently employs approximately 65 people in its saw mill and log procurement operations.  Hull-Oakes is certified as a small business under SBA rules.  The company specializes in producing exceptionally long timbers, up to 85 feet, and to produce these products it requires a reliable supply of large dimension logs.  Hull-Oakes supplies part of its required timber supply from 10,000 acres of its own

Page 17 - Complaint

timberland, has historically procured the rest of its required timber supply from BLM's Salem District, and wants to continue to do so in the future.

40.   At full capacity the Hull-Oakes mill can process 18–20 million board feet of timber per year. However, in recent years it has only be able to process 16–18 million board feet of timber because it has been unable to get enough of the larger diameter logs that allow the mill to run most efficiently.  The last time Hull-Oakes was able to purchase a BLM timber sale directly by placing the highest bid at auction was in 2006. Its most recent attempt was earlier in 2015. Because of the shortage of volume being sold by the BLM, Hull-Oakes was outbid by its competitors.  Hull-Oakes has been injured, and faces imminent threat of future injury by BLM's failure to offer the full legally-required level of ASQ sales.

41.   At the present time lack of available timber supply is limiting the amount of finished products Hull-Oakes can produce and sell.  If more BLM ASQ timber were sold at auction, the company would bid on those sales and believes it would be very likely to obtain a BLM timber sale to increase the volume of its finished products at a lower raw material  cost, which would make the company more profitable.

42.   In the decade of 1980-89, the company and its predecessors relied on the BLM to provide 80 percent of the 19 million board feet of timber its processed on average every year.  Hull-Oakes normally purchased four or five BLM timber sales each year. The Forest Service would provide Hull-Oakes 5 percent of the company's timber and the remaining 15 percent would come from other sources.

Page 18 - Complaint

43. There is no reasonable prospect that a higher level of Forest Service timber sales will be forthcoming in the foreseeable future. BLM ASQ timber sales are the only plausible source of additional high-quality large-diameter timber that Hull-Oakes could purchase through a multi-year timber sale that would allow the company to operate at capacity, increase its profitability and make its business more secure.

44. Hull-Oakes owns approximately 10,000 acres of private timberland that supplies a portion of its annual timber requirements. Some of these lands are directly adjacent to BLM land. Hull-Oakes' land is threatened with loss resulting from wildfire starting on unmanaged or mismanaged BLM land and spreading onto Hull-Oakes property. The risk of this injury is substantial, and the risk has substantially increased since 1995 due to BLM mismanagement.

45. Plaintiff Starfire Lumber Co., Inc. (Starfire) is a family-owned small business that manufactures high grade Douglas-fir lumber, including beams, stringers, timbers, clears and other specialty cuttings, at its mill in Cottage Grove, Oregon. Starfire is a member of AFRC and DTO. Starfire owns virtually no commercial forestland so timber sales from federal land are a vital source of timber. Starfire obtains its logs from O&C lands including the Salem, Eugene, and Roseburg BLM Districts as well as the Mt. Hood, Willamette, Siuslaw and Umpqua National Forests. The federal forests formerly provided a steady supply of high quality large logs suitable for Starfire's operations, but federal timber sales containing high quality logs have sharply declined even though these federal lands contain a huge inventory of large high quality trees.

46. Starfire currently has 72 employees, and processes approximately 2.5 million board feet

Page 19 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347   ●   E-mail: markrutzick@rutzick.com

of timber per month, equal to 30 million board feet per year.  It currently operates one shift at the mill, but with additional reliable timber supply it would expand its operations by adding a second shift and hiring new employees to work that shift, which would make the company more efficient and more profitable.  However at the present time Starfire does not have any additional reliable source of timber supply that would permit it to add a second shift.  Starfire is certified as an SBA small business, and can sell all the forest products it produces without difficulty.

47.  In the 1980's and early 1990's, when federal timber supply was more plentiful, Starfire company operated three shifts, employing 120 workers and consuming about 4.5 million board feet per month, equal to 54 million board feet per year.  At that time approximately 70-90 percent of its timber supply came from federal forestlands within its sourcing radius (the geographic distance at which Starfire can afford to ship logs to the mill). Of that portion of its timber supply, approximately 15 percent came from the BLM and approximately 85 percent from USFS.  However since the Northwest Forest Plan was adopted in 1994 reducing federal timber sales by more than 80 percent, the availability of BLM and Forest Service timber has dropped sharply.  Today only approximately 1 percent of Starfire's log supply comes from BLM.  About 1.5 percent comes from the Forest Service, and the rest of its log supply comes from private timberland owners.  Starfire has no long term contracts with any supplier.   The company purchases logs one month at a time at a negotiated price based on current log market prices.

48.  Starfire processes large-diameter logs that commonly comprise only a small proportion of the typical federal timber sale today.  Currently, Starfire does not own any BLM or Forest Service

Page 20 - Complaint

timber sales, but the company regularly purchases BLM and Forest Service logs from other companies that purchase a federal timber sale, operate the sale and then sell Starfire the large-diameter logs from the sale, which normally are too big to be processed in most small-dimension sawmills.  In particular, BLM ASQ sales are most likely to contain large-diameter logs suitable for Starfire while the non-ASQ thinning sales have few if any large-diameter logs suitable for Starfire.  All of the BLM and Forest Service logs Starfire currently owns came from other purchasers of federal timber sales, although on occasion Starfire will bid on and buy a BLM timber sale.  All of the O&C Lands are within its sourcing radius.  Starfire has been injured, and faces imminent threat of future injury by BLM's failure to offer the full legally-required level of ASQ sales.

49.  There is no prospect the Forest Service will increase its annual harvest level in the near future, and there is no prospect that any private timberland owner will enter into a long-term supply contract with Starfire, or will increase the monthly volume of timber Starfire purchases at the present time.  The only plausible source of increased timber supply in its area is the BLM.  Starfire purchases BLM logs originating on the Salem, Eugene, and Roseburg BLM Districts.  If these districts offered a higher volume of ASQ timber sales, it is very likely that the additional ASQ sales would contain additional large-diameter logs, and that Starfire would be able to purchase additional logs from such sales.  In addition, if more BLM ASQ sales were offered on these districts, Starfire would have a better chance to purchase a sale at competitive auction, which would be a source of profit for the company even if it sells the small-diameter logs to other enterprises.

50.  Plaintiff C & D Lumber Co. (C & D) is a family-owned manufacturer of lumber and wood

Page 21 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

products located in the small town of Riddle, Oregon, where it has operated for more than 60 years. C & D is a member of AFRC and DTO.  C & D operates a cutting mill that uses larger, high quality Douglas-fir, incense cedar and Port Orford cedar logs, employs about 125 workers at its mill and associated facilities, and produces about 80 million board feet of lumber annually.  C & D has no trouble selling all of the forest products it produces.  C & D purchases and has historically depended heavily on timber sold from the O&C lands in the BLM's Medford and Roseburg Districts and from the Umpqua and Willamette National Forests and timber supplied by other private and state timberland owners for the balance of raw materials needed to operate its processing facility.  C & D is certified as an SBA small business.

51.     Riddle is a small town in Douglas County, in rural southwestern Oregon, with a population of about 1,000.  C & D was founded in Douglas County, and has operated there for more than 60 years. When it is in full operation C & D normally processes between 40 million board feet and 45 million board feet of timber per year.  Silver Butte Timber Company, a sister company of C & D with common ownership, owns 45,000 acres of forest land in Douglas, Coos, Jackson and Josephine Counties, Oregon, which is adjacent to or intermingled with federal land including land managed by the BLM.  The Silver Butte lands can supply C & D with only about 15-25 percent of its required raw material supply.  C & D recently made a significant mill modernization update, and with adequate timber supply it expects to continue indefinitely to provide wood products to its customers for use in building construction throughout the United States.

Page 22 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

Without an adequate supply of timber, C & D faces the prospect of being forced to shut down, lay off all its employees and close its doors forever.

52.     C & D's sister company, Silver Butte, owns land in Douglas County, Oregon. Approximately 80-90 percent of Silver Butte's holdings are adjacent on at least two, and in some cases four, sides to timber lands managed by the BLM which are subject to management under the 1937 O&C Act. The management practices on the adjoining BLM lands directly and substantially influence the health and safety of Silver Butte's timberland assets.

53.  From the beginning, the business plan for Silver Butte has been to reinvest its profits in timber lands.  In recent years, this investment practice as become questionable because of the poor management and fire prone condition of much of the land managed by the BLM.

54.  The failure of the BLM to offer the level of ASQ timber sales required by the permanent forest production mandate of the O&C Act directly and substantially harms and threatens to harm C & D. The absence of these ASQ timber sales denies C & D the opportunity to bid on a supply of timber that it would like to bid on and purchase at competitive auction in the upcoming months and years to meet the increasing demand for home construction materials in the United States. In addition, an increase in timber sales would mean more effective and proactive management of BLM forestlands, reducing the risk of fire, disease or insect infestation starting on BLM land and spreading to Silver Butte's land. There is a substantial probability that Silver Butte's lands will be directly and substantially harmed by the failure to offer the sales mandated by the O&C Act, which results in management of these lands according to the irresponsible and dangerous

Page 23 - Complaint

standards of the 1995 plans. The risk of fire, disease or insect infestation starting on BLM land and spreading to adjoining C & D land has substantially increased due to BLM land mismanagement, will continue to increase, and is substantial at the present time.

55. South Coast Lumber Co. (South Coast), based on the southwestern coast of Oregon just above the California border, produces a variety of wood products including concrete forms and concrete forming panels, green and kiln dried Douglas fir lumber, plywood and door and window components. South Coast is a family-owned business which has been in operation since 1950. South Coast is a member of AFRC. South Coast currently employs over 450 workers directly and processes about 8.5 million board feet of timber per month at the present time. South Coast does not currently operate at full capacity. If it did, it would employ nearly 500 workers directly and process over 13 million board feet of timber per month. South Coast does not operate at capacity at the present time because it is unable to purchase a reliable supply of sufficient timber to permit capacity operation. South Coast could sell all the forest products it could produce at full capacity.

56. South Coast relies heavily on ASQ timber sales offered by the BLM's Coos Bay district. South Coast also bids on and attempts to purchase non-ASQ sales from the Coos Bay district as well as timber sold by the Rogue-Siskiyou national forest, Oregon state lands and private timber sellers. South Coast's affiliate CLR Timber Holdings, Inc. owns 94,000 acres of timberland which it operates on a long-term sustained-yield basis and supplies 35 percent of South Coast's annual timber

Page 24 - Complaint

requirements.  Some of CLR's land is adjacent to BLM land.  CLR Timber Holdings cannot increase its annual production from its lands without destroying their long-term ability to maintain sustained-yield timber production.  Nor can the Forest Service, Oregon state lands or private timber sellers increase their sales levels in a manner that would provide South Coast a reliably larger timber supply that it has available at present.  BLM non-ASQ timber sales also are not a reliable source of timber supply since there is no assurance that any particular level of sales will be provided year after year.  BLM ASQ sales are the only available source of any reliable increase in timber sales that could permit South Coast to increase its output and its profitability.

57.  Boise Cascade Wood Products, L.L.C. ("Boise Cascade") is a wholly owned subsidiary of Boise Cascade Company ("BCC"), a public company listed on the New York Stock Exchange. Boise Cascade has manufacturing operations in Oregon, Washington, Idaho, Louisiana, North Carolina and South Carolina.  In Western Oregon, Boise Cascade owns and operates veneer mills in Willamina and White City, and plywood mills in Medford and White City.  These locations produce plywood and parallel laminated veneer (PLV) plywood used for Boise Cascade's Engineered Wood Products facility in White City, Oregon.

58. In addition to producing veneer at Boise Cascade's log processing veneer mills, Boise Cascade also purchases veneer from other manufacturers who purchase and rely on BLM and other federal timber sales for their production and capacity needs.

Page 25 - Complaint

59. At planned operating levels for this year, Boise Cascade's veneer mills will process approximately 166 million board feet of logs. At full capacity, and if Boise Cascade's log supply from the BLM and other sources was sufficiently strong and reliable, Boise Cascade's veneer mills could process approximately 270 million board feet per year over the long term. Boise Cascade has a distribution system across the United States and could easily sell the forest products it could manufacture at full capacity.

60. Presently, Boise Cascade's Western Oregon manufacturing operations consist of 810 employees; if full capacity were achieved, as set forth above, Boise Cascade would need approximately 940 employees. This type of growth would substantially reduce Boise Cascade's fixed and investment costs on a per unit basis.

61. Boise Cascade does not own private timberland. With the current unacceptably low harvest levels from BLM and USFS timber sales, Boise Cascade is heavily dependent on timber and logs from private lands. Those private lands are to a large degree situated in a checkerboard pattern with BLM/O&C lands, and in fact many thousands of acres have been burned in the past decade or so, due in large part from fires that burned through and out of overly stocked dense BLM forests in Southwest Oregon. As such, Boise Cascade's future log supply from private timberlands is, and continues to be, severely threatened, as well-stocked young stands of trees (planted and established

Page 26 - Complaint

under the Oregon Forest Practices Act) continue to burn, resulting in reduced future availability of timber that could have been sourced from those lands.

62.   In the recent past, Boise Cascade purchased timber sales from the Medford, Roseburg, Klamath Falls and Salem districts of the BLM.  Boise Cascade also purchased timber sales from the USFS on the Rogue-Siskiyou, Umpqua and Siuslaw National Forests, as well as from Josephine County and multiple Oregon Department of Forestry lands in Boise Cascade's operating areas.  Last year, Boise Cascade purchased and harvested timber from the BLM Rogue Cow Salvage timber sale that burned in the Glendale fire complex.  This year, Boise Cascade was the successful bidder on, and is currently operating on, the Down the Chute timber sale from the BLM Klamath area and the Fall N Grizzly timber sale from the BLM's Ashland Resource area of the Medford BLM district (which are salvage timber sales that burned in the Oregon Gulch fire last year).

63.   For the reasons stated above, Boise Cascade has been injured by the BLM's inability to sell enough ASQ timber sales to meet the requirements of the O&C Act's promised harvest level, and there is a substantial probability of imminent future injury to Boise Cascade from the lack of additional BLM timber sales necessary to meet the statutory sale quantity requirement.

64.   Robert E. Ragon owns a 440 acre parcel of timberland called Bear Mountain Ranch. Mr. Ragon has engaged in hunting on his property, and intends to do so again in the near future.  His property is adjacent to BLM land, and his ability to use his own property for hunting is directly and

Page 27 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

substantially threatened by BLM's failure to manage its timberlands to reduce the risk of catastrophic wildfire, which could easily spread to Mr. Ragon's property, destroying the standing timber and making recreational hunting impossible for many years to come.  The risk of catastrophic wildfire starting on BLM land and spreading uncontrollably to Mr. Ragon's land has substantially increased over the past 20 years due to BLM's failure to sell the full determined and declared allowable sale quantity on its lands.

65. Plaintiff American Forest Resource Council (AFRC), a nonprofit corporation organized under the laws of the state of Oregon, is a forest products trade association located in Portland, Oregon which represents approximately 60 lumber and plywood manufacturing companies and landowners throughout the states of Washington, Oregon, California and elsewhere in the western United States.  Among AFRC's members are plaintiffs C & D Lumber Co. Freres Lumber Co. Inc, Seneca Sawmill Company, Starfire Lumber Co., Inc., Rough & Ready LLC, Boise Cascade Wood Products, LLC, South Coast Lumber Co. and Swanson Group Mfg. LLC , as well as companies such as Hampton Industries, with operations in Washington and Oregon;  Interfor Pacific, Inc., with operations in Oregon, Washington and elsewhere; Rosboro, LLC, based in Oregon; and Roseburg Forest Products, with operations in Oregon and California, all of which have purchased BLM timber sales within the past 36 months and seek to purchase more such sales.  Many of AFRC's members could not continue to operate without a reliable and adequate supply of timber sold by the BLM and national forests.  Many of AFRC's members seek the opportunity to bid on and purchase future BLM

Page 28 - Complaint

timber sales.   All of AFRC's members who operate in western Oregon, including all of the manufacturing plaintiffs described above, have been injured by the operation of the Owl Estimation Methodology described below, which has limited the volume of available timber sales in all of the O&C districts.

66.   One of AFRC's primary purposes is to represent the interests of its members on matters relating to federal timber supply. AFRC and its predecessors have served as the representative for the forest products industry on major regional federal land management decisions since 1986.   AFRC collects information about the environmental, economic and social impacts of these major federal land management decisions, and disseminates this information to its members and participants, to public officials and to thousands of members of the public that are directly affected by these decisions.

67.   AFRC also represents the interests of its members who own private forest land, including many who own private forest land intermingled with, adjoining or adjacent to BLM forests, such as Freres Lumber Co./Freres Timber, Seneca Sawmill/Seneca Jones, C & D Lumber Co./Silver Butte, South Coast Lumber Co./CLR Timber Holdings and Rough & Ready/Perpetua.   The ability of these companies to manage their own lands has been injured by the BLM's management of the O & C lands.   The risk of fire, disease or insect infestation starting on BLM land and spreading to nearby private land has been greatly increased since 1995 because the 1995 resource management plans hinder or proscribe land management activities, including implementation of hazardous fuel

Page 29 - Complaint

reduction projects, on hundreds of thousands of acres of the BLM lands in question.   These

restrictions present a substantial threat to AFRC members' lands in the vicinity of these BLM forests.

68.   Plaintiff Douglas Timber Operators, Inc. (DTO), a nonprofit corporation organized

under the laws of the state of Oregon, is a forest products trade association located in Roseburg,

Oregon which represents approximately 145 timber and logging companies and other businesses

operating in Douglas, Coos and Lane Counties and elsewhere in Oregon.   DTO's membership

includes businesses in every segment of the forest products industry, from logging companies and

small independent sawmills to large integrated manufacturers.   DTO's members include such

companies as C & D Lumber Co.; Starfire Lumber Co.; Roseburg Forest Products Co.; Herbert

Lumber Co., based in Riddle, Oregon; and Douglas County Forest Products, based in Winchester,

Oregon.   DTO's members purchase many timber sales that are offered by the Roseburg, Coos Bay

and Medford BLM districts as well other BLM districts and the Umpqua National Forest.   These

companies have historically depended in large measure on ASQ timber sold by the BLM and the

USFS for their timber supply.   One of DTO's primary purposes is to represent the interests of its

members on matters relating to federal timber supply.   Some of DTO's members own private

timberlands that are substantially threatened by the BLM's ongoing mismanagement of the O&C

lands.

69.   Defendant S.M.R. Jewell, the Secretary of Interior, is the official responsible for

supervising the BLM and the FWS.   The Secretary of Interior has been personally involved in

Page 30 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

decisions affecting federal timber supply in the northern spotted owl region including many of the decisions involved in this case.  On October 25, 2010 Secretary Jewell's predecessor, Ken Salazar, convened a meeting in Roseburg, Oregon of industry and environmental advocates for the express purposes of discussing the causes of the ongoing reduction in BLM timber sales in Oregon, and seeking solutions to this problem.

70.   Defendant Tom Vilsack, the Secretary of Agriculture, is the official responsible for supervising the USFS.

## BACKGROUND ALLEGATIONS

A.  The BLM's western Oregon "O & C lands."

71.   The BLM manages approximately 2,557,800 acres of federal forest land in western Oregon, including 2,151,200 acres extending from Salem, Oregon some 250 miles south to the California border that had been ceded in the 19th century to two expanding railroads – the Oregon and California Railroad and the Coos Bay Wagon Road – and were subsequently revested to public ownership by act of Congress in 1916.  These revested areas, administratively divided among six BLM districts, are managed under the O&C Act, 43 U.S.C. §1181a, and are commonly referred to as the "O&C lands." The BLM Medford District, in Jackson and Josephine County, Oregon, contains 764,900 acres of O & C lands.  The BLM Roseburg District, in Douglas County, Oregon, contains 406,500 acres of O&C lands.  The BLM Coos Bay district, in Coos, Curry and Douglas County, Oregon, contains 278,826 acres of O&C lands.  The BLM Eugene district, in Benton, Douglas, Lane and Linn County, Oregon, contains 302,944 acres of O&C lands.  The BLM Salem district, in Linn,

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

Benton, Polk and 10 other northwestern Oregon counties, contains 346,677 acres of O&C lands.  The

BLM Klamath Falls Resource Area of the Lakeview district in Klamath County, Oregon, contains

46,900 acres of O&C lands.

72.  The O&C Act directs that "[O & C lands] classified as timberlands ... shall be managed

. . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in

conformity with the principal [*sic*] of sustained yield."  *Id*.  The O&C Act further directs that 50%-

75% of all receipts from O&C land timber sales must be returned to the 18 western Oregon counties

in which those lands are found.  Implementing the statutory direction, BLM management plans for

its six western Oregon districts in effect for several decades into the 1990's permitted (and regularly

achieved) annual sustained yield timber production of 1.176 billion board feet of timber.

73.  The O&C Act led to the development of a robust family-owned forest products industry

in western Oregon, consisting of small sawmills and plywood plants that generally did not own any

private timber, and relied on timber sales from O&C lands, as well as timber sales from nearby

national forests, to supply the raw materials required to conduct business.  The 18 "O&C Counties"

in western Oregon, in which the O&C lands are found, came to rely on O&C timber receipts for a

large proportion, often a majority, of their annual revenues needed to provide schools, police and

other local services.

B.    The Northern Spotted Owl

74.  The spotted owl (*strix occidentalis*) inhabits forests of western North America from

southern British Columbia through Washington, Oregon, California, Arizona and New Mexico and

Page 32 - Complaint

into northern Mexico.  Three subspecies of the spotted owl have been recognized:  northern (*strix occidentalis caurina*), California (*strix occidentalis occidentalis*) and Mexican (*strix occidentalis lucida*).  The northern spotted owl is found in a range starting in lower British Columbia and extending into northern California almost to the San Francisco metropolitan area.  It is most commonly found in forests containing stands of trees more than 80 years of age.  The northern spotted owl is considered a territorial species which generally occupies an area of land called a "home range."

75.  The ESA protects fish, wildlife and plants through the process of "listing" a species of fish, wildlife or plant as threatened or endangered.  16 U.S.C. §1533(c)(1).  On June 26, 1990 FWS listed the northern spotted owl as a threatened species throughout its range.  55 Fed. Reg. 26114.  Section 7 of the ESA, 16 U.S.C. §1536, requires a federal agency planning to undertake an action that may affect a listed species to complete "consultation" with FWS (or, for certain marine species not relevant to this case, the National Marine Fisheries Service within the Department of Commerce), and to avoid taking any action that is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of designated critical habitat for a listed species.  Section 7 consultation can be formal or informal.  Formal Section 7 consultation is required when a proposed agency action may adversely affect a listed species or critical habitat, and concludes with the issuance by the FWS of a biological opinion, which can include authorization for incidental taking of a listed species, provided in the form of an incidental take statement.  Informal Section 7

Page 33 - Complaint

consultation concludes with a written FWS concurrence in an agency determination that the proposed action is not likely to adverse affect (NLAA) listed species or critical habitat.

76.   Conservation of the northern spotted owl has been a continuing controversy in Washington, Oregon and California for a quarter of a century, principally in the federal forestlands in the three-state region.   Federal forest managers have attempted to reconcile the spotted owl's conservation needs with other intended uses of the federal forests, including sustained-yield timber production.  Dozens of federal lawsuits have challenged those reconciliation efforts, which have sometimes been judged inadequate.

C.   Recent BLM Failure to Meet Sustained Yield Timber Sale Levels

77.   On April 13, 1994 the Secretary of Interior issued the Record of Decision (1994 ROD) for planning documents known as the Northwest Forest Plan (NWFP) to govern the administration of the BLM's western Oregon districts, contemporaneous with the Secretary of Agriculture's approval of the same decision for approximately 21,000,000 acres of national forest land within 19 national forests in western Washington, western Oregon and northern California.  The plan was conceived by the Clinton Administration at President Clinton's direction as a means of resolving the regional conflict between species conservation and sustained-yield timber harvesting.  The NWFP created several categories of reserves (including late-successional reserves, riparian reserves, wildlife reserves and adaptive management areas) where sustained-yield timber harvesting is prohibited or severely constrained, and permits sustained yield timber management on just 15% of the forested land base.

Page 34 - Complaint

78.  In 1995 the BLM adopted revised Resource Management Plans (RMPs) for each of its six western Oregon districts largely based on the direction in the NWFP.  Collectively the six plans reduced the permissible annual sustained yield timber level on the O&C lands to 211 million board feet, an 82% reduction from the prior authorized level (further reduced in 2001 to 203 million board feet).  The RMPs provided that the great majority of timber volume to be offered for sale would come from timber management techniques with the silvicultural objective of regenerating timbered stands following harvest, and which therefore include a considerable proportion of older and larger timber.

79.  The 1995 Medford District RMP established an annual allowable sustained yield sale quantity of 57.1 million board feet of timber.  The 1995 Roseburg District RMP established an annual allowable sustained yield sale quantity of 45.0 million board feet of timber.  The 1995 Coos Bay District RMP established an annual allowable sustained yield sale quantity of 27.0 million board feet of timber.  The 1995 Eugene District RMP established an annual allowable sustained yield sale quantity of 33.0 million board feet of timber.  The 1995 Klamath Falls Resource Area RMP established an annual allowable sustained yield sale quantity of 6.4 million board feet of timber.  The 1995 Salem District RMP established an annual allowable sustained yield sale quantity of 34.8 million board feet of timber.

80.  Since 2004 all six of the BLM's O&C districts have failed to sell or offer for sale annually volumes of sustained-yield (ASQ) timber sales equal to the declared 1995 RMP allowable annual sale quantity for each district:

Page 35 - Complaint

| Volume of BLM Timber Offered for Sale 2004-14: (millions of board feet) | | | | |
|---|---|---|---|---|
| District | 1995 RMP ASQ (current level) | Volume of Sustained-yield Sales Required to be Sold or Offered in 2004-10 (10 years) | Actual Sustained-yield Sales offered in 10 years | Shortfall below ASQ over 10 years |
| Coos Bay | 27.0 | 270.0 | 190.6 | 79.4 |
| Eugene | 33.0 | 330.0 | 300.0 | 30.0 |
| Lakeview | 6.4 | 64.0 | 46.0 | 18.0 |
| Medford | 45.0 | 450.0 | 260.2 | 189.8 |
| Roseburg | 57.1 | 571.0 | 278.6 | 292.4 |
| Salem | 34.8 | 348.0 | 332.9 | 15.1 |
| **Six District Total** | **203.3** | **2033.0** | **1408.3** | **624.7** |

D.    Adoption of Owl Estimation Methodology.

81.  In February 2007 the Ninth Circuit ruled in *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007), that the incidental take statement the FWS used in many of its biological opinions on proposed federal actions likely to adversely affect northern spotted owls improperly used acres of habitat to describe the amount or extent of permitted take without adequately explaining why FWS could not use numbers of owls to define the permissible take level, and also did not contain an adequate mechanism for triggering reinitiation of consultation in the event the amount or extent of permitted take was exceeded during implementation of the project.

82.  In September 2007 FWS, BLM and the USFS jointly responded to the *Oregon Natural Resources Council* decision by approving and agreeing to employ a document entitled "Methodology

Page 36 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

for Estimating the Number of Northern Spotted Owls Affected by Proposed Federal Actions," also known as the "Owl Estimation Methodology" (OEM). On September 15, 2008 the three agencies issued Version 2.0 of the OEM to supersede and replace the 2007 document. The OEM applies to any proposed BLM or USFS action that may affect forest stands containing habitat suitable for nesting, roosting or foraging (NRF) of northern spotted owls. The OEM describes its purpose as follows:

> The following procedures are intended to reasonably estimate the number of northern spotted owls (*Strix occidentalis caurina*) that are likely to occur within the area affected by a proposed Federal action (in consultation terms, the "action area") for the purpose of completing effect determinations in Biological Assessments (BAs) under informal consultation and jeopardy analyses and incidental take assessments in Biological Opinions (BiOps) under formal consultation. This information will be used to characterize, in part, the Environmental Baseline, Effects of the Action, and Cumulative Effects sections of a BiOp, and the amount of take, if any, exempted in an Incidental Take Statement (ITS).

83. The OEM requires that any proposed BLM or USFS action submitted for Section 7 consultation must be accompanied by a Northern Spotted Owl Occupancy Map (NSOOM) of the area surrounding the proposed action, which must be developed as specified in the OEM. For areas where historical on-the-ground surveys have been conducted to locate northern spotted owls, the map will rely on such surveys. However, there are millions of acres of federal and non-federal forest land where no spotted owl surveys have ever been conducted. For these unsurveyed areas, the OEM requires use of a computer-assisted tool that randomly places "computer-generated" owl sites on the

Page 37 - Complaint

map within areas where spotted owl habitat is projected to exist in an amount and configuration such that spotted owls could be present. The OEM requires use of the assumption that spotted owls actually occupy every computer-generated site, although the document acknowledges this assumption is not correct.

84. Once the NSOOM map is completed, a representation of the proposed agency action is overlaid on the map. For a proposed agency action that is not sufficiently developed to be mappable, BLM or USFS must still prepare the NSOOM map using their best approximation of the location, size and configuration of the proposed action.

85. The OEM requires that the FWS, BLM and USFS must evaluate the effects of the proposed action at three specific geographic levels: 1) a "nest site" consisting of a circle with a 300 meter radius around the actual or computer-generated nest tree; 2) a "core area" consisting of a circle with a .5 mile radius around the actual or computer-generated nest tree; and 3) a "home range" consisting of a circle with a variable radius ranging from 1.2 miles to 2.7 miles around the actual or computer-generated nest tree based on data drawn from particular geographic sub-regions.

86. The OEM requires that the FWS, BLM and USFS must determine adverse effects and incidental take within each of these three circles through application of three precise formulae: 1) any reduction of suitable NRF habitat within the nest site circle; 2) suitable NRF habitat below 50% within the core area circle; and 3) suitable NRF habitat below 40% within the home range circle.

87. The OEM asserts that it is based on the "best available information," and was reviewed and commented upon by "agency biologists responsible for the application of the methodology along

Page 38 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

with leading spotted owl researchers." The OEM represents the settled position of the FWS, BLM

and the USFS as to the manner in which incidental take determinations should be made for northern

spotted owls until such time, if ever, that the agencies revise the OEM "as new information becomes

available." The OEM constitutes judicially-reviewable final agency action.

88. The intended and practical effect of the OEM is to mandate its use for Section 7 review

of any timber sale project proposed by the BLM or the USFS in an area containing spotted owl NRF

habitat: "All projects scheduled for implementation as described in a BiOp will use a process similar

to that described under Section A above to quantify (in advance of implementing the projects) and

report the amount of incidental take on a project-by-project basis to ensure that the incidental take

limit set forth in the ITS portion of the BiOp is not exceeded." An exception to the mandatory use

of the OEM by the BLM or USFS may be permitted only if the agency's biological assessment (BA)

submitted to FWS to initiate a consultation "include[s] a clear and complete discussion of the

justification." The OEM does not identify any justification that would be acceptable to FWS.

89. As a signatory to the OEM, the BLM agreed to use the OEM for all of its biological

assessments of proposed timber sale projects within the range of the northern spotted owl, and every

BLM BA prepared between October 2008 and October 3, 2013 (the date further use of the OEM was

enjoined by the Court in *Swanson Group v. Salazar*, No. 10-1843) on proposed timber sale projects

in western Oregon employed the OEM methodology. BLM, USFS and FWS stopped using the

OEM as of October 3, 2013 to comply with the *Swanson Group* order. In every case between

October 2008 and October 3, 2013 where the OEM indicated that a proposed action would adversely

Page 39 - Complaint

affect spotted owls because following the action northern spotted owl habitat would be below one or more of the three fixed levels, the BLM initiated formal consultation; where the OEM did not indicate such adverse effects, the BLM requested the FWS to concur in an NLAA determination. Following the dismissal of *Swanson Group v. Salazar*, No. 10-1843 for lack of subject matter jurisdiction, BLM, USFS and FWS are free to resume use of the OEM, and it is very likely that they will do so.

90. The BLM's agreement or acquiescence in 2007 and 2008 to the mandatory use of the OEM has had practical and substantial consequences to the BLM, the plaintiff companies and members of the plaintiff associations who rely on BLM timber sales. Since an OEM-compelled BLM determination that a proposed project is likely to adversely affect the northern spotted owl requires the BLM to submit the proposed project to FWS for formal consultation under 50 C.F.R. §402.14, Section 7(d) of the ESA thereafter generally requires the BLM to refrain from proceeding with the project until the consultation is concluded and a biological opinion has been issued by FWS. These procedures can and do delay implementation of BLM projects months or years, and can and do make it impossible for the BLM to sell or offer to sell the annual allowable sale quantity of timber declared in the RMPs. Issuance of a biological opinion requires the FWS under 16 U.S.C. §1536(b)(4) to provide incidental take authorization, and to impose mandatory reasonable and prudent measures and terms and conditions to minimize such incidental take. These measures can and often do increase the cost and delay performance of the contract, which imposes additional expense on the bidder that ultimately is awarded the contract to perform the project. These measures may also or alternatively

Page 40 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

reduce the amount a bidder is willing to pay for the contract, lowering receipts to the BLM (and potentially to the 18 O&C Counties) from the performance of the contract.

91.   An OEM-compelled NLAA determination does not require the initiation of formal consultation, but requires submission to the FWS of a request for informal consultation and a written concurrence by the FWS with the BLM's NLAA determination.   Unlike formal consultation, there is no statutory deadline for completion of informal consultation, and neither the BLM nor prospective bidders can accelerate issuance of an FWS concurrence letter.   As with biological opinions, the delay and uncertainty resulting from informal consultation that is compelled by the OEM methodology can and do make it impossible for the BLM to offer the annual allowable sale quantity of timber declared in its RMPs, and can and do result in additional costs to the contractor or reduced revenue to the BLM.

92.   FWS employed the OEM in every biological opinion it has issued for BLM or USFS timber sale projects in western Oregon that were determined to be "likely to adversely affect" spotted owls between October 2007 and October 3, 2013 , including:  1) April 2, 2009 Biological Opinion Regarding the Effects of Habitat Modification Activities within the North Coast Province, FY 2009-2010, proposed by the BLM Eugene District, BLM Salem District and Siuslaw National Forest; 2) the subsequent amendment to this opinion, issued July 24, 2009; 3) August 4, 2009 Biological Opinion on the Roseburg District BLM Fiscal Year 2009-10 Program of Activities; 4) June 10, 2010 Biological Opinion on the Proposed BLM Medford District Grants Pass Resource Area Fiscal Year 2010-11 Timber Harvest Activities; 5) July 19, 2010 biological opinion on the Summer 2010 Timber

Page 41 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

Harvest Activities Proposed by the BLM Medford District; 6) biological opinion on USFS timber sale projects on the Shasta-Trinity National Forest in California dated July 31, 2009; 7) biological opinion on USFS timber sale projects on the Umpqua National Forest in Oregon dated July 1, 2009; 8) biological opinion on USFS timber sale projects on the Fremont-Winema National Forest in Oregon dated November 17, 2008; 9) biological opinion on USFS timber sale projects on the Willamette National Forest in Oregon dated September 7, 2007 (based on the 2007 version of the OEM); 10) biological opinion on Grants Pass Resource Area, Medford District, for Fiscal Years 2012-13, dated June 28, 2012; and 11) biological opinion on USFS timber sale projects on the Gifford Pinchot National Forest in Washington dated July 20, 2009.

93. FWS has also employed the OEM in every letter of concurrence it has issued for BLM or USFS timber sale projects in western Oregon determined to be NLAA for spotted owls between October 2007 and October 3, 2013, such as "Endangered Species Act Section 7 Informal Consultation regarding Summer FY 2011 Activities that are not likely to adversely affect the northern spotted owl on Public Lands administered by the Medford District of the Bureau of Land Management," dated November 2, 2011.

94. The BLM has also agreed, or been ordered by the Secretary of Interior, to incorporate a set of restrictive management practices called Project Design Criteria into its proposed timber sale projects. "Project design criteria (PDC) are measures applied to project activities designed to minimize potential detrimental effects to proposed or listed species. PDC usually include seasonal restrictions and may also include clumping of retention trees around nest trees, establishment of

Page 42 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347   ●   E-mail: markrutzick@rutzick.com

buffers, dropping the unit(s)/portions, or dropping the entire project." Grants Pass Resource Area 2010-2011 BiOp at 70. The BLM's PDC impose mandatory restriction distances to avoid disturbance to spotted owl sites, and apply not only to known owl sites but also to computer-generated ("predictive" or "estimated") sites determined through the OEM. The PDC prohibit the use of chain saws, pile drivers, jackhammers or rock drills within 195 feet of an owl site, an area encompassing approximately two-thirds of one acre of land. Blasting with explosives is banned within 360 feet of an owl site. In this indirect manner, the OEM imposes further costs, burdens and uncertainties on timber sale purchasers, including an ongoing threat that the entire sale may be cancelled.

95. For the projects addressed in the Grants Pass Resource Area 2010-2011 BiOp and the July 19, 2010 Medford District BiOp, the BLM submitted biological assessments based on a set of Project Design Criteria that included the mandatory restriction distances discussed in paragraph 94. In those two biological opinions, the FWS unilaterally expanded the mandatory restriction distances for computer-generated ("estimated") owl sites: "Radius distances were increased by 656 feet (200 meters) around estimated nest sites to provide additional protection, since the exact location of owls is unknown in these areas." Grants Pass Resource Area 2010-2011 BiOp at 71; July 19, 2010 Medford District BiOp at 81. The FWS PDC expanded the prohibition on the use of chain saws, pile drivers, jackhammers or rock drills from 195 feet to 851 feet of an owl site, an area encompassing approximately 50 acres of land (*i.e.*, 70 times as much as in the BA). The explosive no-blast zone was increased from 360 feet to 1,020 feet for computer-generated sites, restricting operations over

Page 43 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

an extra 60 acres.  The FWS BiOps thus required the BLM to provide far more habitat protection at

computer-generated sites, where no owl has ever been found, than at known occupied sites.

96.  The actions, omissions and failures alleged herein are causing current and threatened

injury to each plaintiff, who has no remedy at law for these injuries.  These injuries include economic,

environmental and procedural injuries.

### FIRST CLAIM FOR RELIEF

**(Against Defendant Jewell; violation of the O&C Act, 43 U.S.C. §1181a; failure to comply
with non-discretionary duty to offer for sale in each O&C district an annual volume of
sustained-yield timber sales equal to the allowable sale quantity determined and declared in
applicable BLM resource management plan; agency action unlawfully withheld or
unreasonably delayed under 5 U.S.C. §706(1); arbitrary and capricious agency action
under 5 U.S.C. §706(2))**

97.  Plaintiffs repeat and reallege the allegations in paragraphs 1-96 as if fully set forth herein.

98.  The O&C Act, 43 U.S.C. §1181a, directs that timber on the O & C lands shall be sold,

cut, and removed in conformity with the principle of sustained yield.

99.  Between fiscal year 2004 and 2013 the BLM failed to sell or offer to sell timber on each

of its six O&C districts equal to the annual allowable sale quantity for each district declared in the

district's RMP.  The minimum sale level for that six year period is 2,033 million board feet, but the

BLM offered for sale only 1,408.3 million board feet, leaving an unlawful shortfall of 624.7 million

board feet.

100.  Between fiscal year 2009 and 2014, the BLM violated its non-discretionary duty to sell

or offer to sell timber on all six of its O&C districts that is equal to the declared annual allowable sale

quantity for the district.  The BLM will continue to violate its non-discretionary duty again in 2015

Page 44 - Complaint

and future years unless this court intervenes to compel the BLM to comply with its non-discretionary duty.

101.   The BLM's past, current and likely future failure to comply with its non-discretionary duty to sell or offer to sell a volume of sustained-yield timber sales on each of its six O&C districts that is equal to the annual allowable sale quantity for the district constitutes agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. §706(1), and is arbitrary and capricious, an abuse of discretion, not in accordance with law and in excess of statutory authority under 5 U.S.C. §706(2).

## SECOND CLAIM FOR RELIEF
**(Against Defendants Jewell and Vilsack; violation of APA, 5 U.S.C. §553 – adoption of Owl Estimation Methodology without complying with APA rulemaking procedures)**

102.   Plaintiffs repeat and reallege the allegations in paragraphs 1-96 as if fully set forth herein.

103.   Under the APA, 5 U.S.C. §551(4), a "'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."  The Owl Estimation Methodology, Version 2.0 (September 15, 2008) is a rule under the APA, 5 U.S.C. §551(4).  The OEM is a statement of general applicability to Section 7 consultations concerning northern spotted owls throughout western Oregon; it implements, interprets or prescribes law or policy for such consultations; and it describes the procedures to be followed by the FWS as well as the BLM and the USFS. The OEM asserts that it underwent review and some form of input from federal agency biologists, and that it was "finaliz[ed]" based on some consideration of that input.

Page 45 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347  ●  E-mail: markrutzick@rutzick.com

OEM at 2.  The OEM constitutes the final, settled position of the FWS, the BLM and the USFS, and

is the consummation of the agency's decision making process as to the issues addressed in the OEM:

> ... We believe the methodology provides a reasonable basis for the FWS to assess anticipated incidental take of the spotted owl caused by a proposed Federal action and includes procedures for monitoring take-related effects such that reinitiation of consultation can be triggered, as appropriate, prior to completion of the action. The methodology was reviewed by agency biologists responsible for the application of the methodology along with leading spotted owl researchers. Their comments were considered in finalizing this document.

104.  In practice the OEM imposes the obligation on the BLM and the USFS to conduct

effects analysis on proposed agency actions that may affect northern spotted owls in accordance with

the OEM's precise methodology, and denies the BLM and the USFS the discretion to select a

different method of conducting effects analysis.  Further, FWS considers that the OEM constitutes

the "best available science" on the subjects it addresses, which effectively binds the FWS to employ

the OEM in its consultations until such time as it determines the OEM does not constitute the best

available science.

105.  The OEM's effects formulae dictate when the BLM or the USFS must initiate formal

consultation or informal consultation on a proposed agency action.  The nature and course of such

consultations influence the timing and content of the agency action, and ultimately impair the ability

of the BLM to meet its non-discretionary duty to maintain an actual timber sale level for its six O&C

districts equal to the annual allowable sale quantity for each district.

Page 46 - Complaint

106.   The OEM also has the practical effect of requiring the FWS in formal consultation and informal consultation to conduct effects analysis on proposed agency actions that may affect northern spotted owls in accordance with the OEM's precise methodology.   The fact that the FWS has employed the OEM on every occasion it has had the opportunity to do so in western Oregon since the OEM was issued in 2007, and that the BLM and USFS in western Oregon have also uniformly employed the OEM since the OEM was issued in 2007, demonstrates that the OEM is a final, binding agency rule for all three agencies.

107.   The OEM has caused and threatened injury to the plaintiffs.  The OEM has reduced the volume of timber that each district has been able to offer for sale to meet its annual allowable sale quantity.  The OEM compels the BLM and USFS to manage areas of unoccupied spotted owl habitat, where no spotted owl has ever been detected, as if a nesting pair of spotted owls is present, and to provide the same or greater protection to this unoccupied habitat as for occupied habitat.  The consequence is to discourage the BLM and USFS from locating timber sales in spotted owl habitat of any kind.  The OEM (page 9) states that one way to avoid a project having "adverse effects from disturbance" of spotted owls is "[a]void siting projects within or immediately adjacent to NRF habitat."  The OEM does not distinguish computer-generated owls from actual owls, and therefore leads the FWS to grant incidental take authorization in its biological opinions for owls that do not exist. Such take authorization allows the FWS to impose non-discretionary limits (called "reasonable and prudent measures") and other terms and conditions on the operation of a timber sale that encompasses a computer-generated owl site that the FWS would not be allowed to impose in the

Page 47 - Complaint

absence of the contrived OEM generated-site methodology.  A decision by the FWS authorizing the taking of non-existent owls also provides the public with an exaggerated and inaccurate portrayal of the effects of timber sale projects on spotted owls, which may further limit BLM and USFS timber sale planning discretion.

108.  Under the APA, a rule having the textual or practical force of law must be adopted through rulemaking procedures, including a requirement for notice to the public and an opportunity for the public to comment on a proposed rule.  5 U.S.C. §553(b).

109.  The OEM was not adopted through APA rulemaking procedures.  There was no notice to the public and no opportunity for the public to comment on a proposed rule as required under 5 U.S.C. §553(b).

110.  Defendant's failure to adopt the OEM through APA rulemaking procedures violates 5 U.S.C. §553.  Defendant's violation of 5 U.S.C. §553 is arbitrary and capricious, an abuse of discretion, not in accordance with law and in excess of statutory authority under 5 U.S.C. §706(2).

**THIRD CLAIM FOR RELIEF**
**(Against Defendants Jewell and Vilsack; Arbitrary and Capricious Conduct And Abuse of Discretion - Adoption of OEM)**

111.  Plaintiffs repeat and reallege the allegations in paragraphs 1-96 as if fully set forth herein.

112.  The APA requires that any agency decision must articulate a satisfactory explanation for the decision including a rational connection between the facts found and the choice made, and may

Page 48 - Complaint

not be arbitrary and capricious.  The OEM does not present a rational connection between the facts found and the choice made, and has no rational basis.

113.   The OEM requires the BLM and the USFS to assess the effects of their proposed actions based on the assumed existence of randomly centered pairs of computer-generated northern spotted owls that the OEM acknowledges do not in fact exist.  The OEM also requires the BLM and USFS to assess the effects of their proposed actions based on the assumed existence of pairs of northern spotted owls at any nest site where a pair of northern spotted owls has ever at any time in the past been detected although there is no information showing that the site is currently occupied by northern spotted owls.  The OEM requires the BLM and USFS to find that a proposed action is likely to adversely affect a pair of these assumed owls if after the proposed action is completed the proportion of forested areas classified as NRF habitat for northern spotted owls will be below 40 percent within an assumed randomly-drawn home range for the assumed owls, even though the OEM acknowledges that pairs of spotted owl occupy home ranges containing as little as 17 percent of such NRF habitat, and based on that information the OEM is parameterized to generate assumed owl territories with as little as 17 percent NRF habitat.  The OEM does not explain or justify any of these decisions.

114.   The OEM requires the FWS to find that a proposed action may cause incidental take of the pair of assumed owls if following the proposed action the NRF habitat percentage within the assumed home range will be below 40 percent.  Thus, the OEM requires the BLM and the USFS to create computer-generated owl territories where any reduction of NRF habitat – as little as one acre

Page 49 - Complaint

or one tree – results in an FWS finding that incidental take may occur, and a recommendation from FWS to avoid any such reduction in NRF habitat.  Additionally, if the percentage of NRF habitat within a core area or home range starts out below the required level (as many do), the OEM directs the FWS to determine that take may occur even if there is no reduction in such habitat. The OEM also does not explain or justify any of these decisions.

115.  The OEM results in FWS authorization for the BLM or the USFS to incidentally take owls that do not exist, and authorizes FWS to impose costly and burdensome reasonable and prudent measures and terms and conditions on the agency and the contract purchaser to minimize the take of the non-existent owls.  To the extent the FWS requires reinitiation of consultation when incidental take exceeds the number of assumed owl pairs authorized to be taken, the OEM overstates potential take and reduces the likelihood that reinitiation of consultation would ever occur.  The OEM also does not explain or justify any of these decisions.

116. The OEM is arbitrary and capricious, an abuse of discretion, not in accordance with law and in excess of statutory authority under 5 U.S.C. §706(2).

### FOURTH CLAIM FOR RELIEF

**(Violation of the O & C Act; failure to offer all required sales from lands designated for sustained yield timber management; agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. §706(1); arbitrary and capricious agency action under 5 U.S.C. §706(2))**

117.  Plaintiffs repeat and reallege the allegations in paragraphs 1-96 as if fully set forth herein.

118.   The RMP for each O & C district determines and declares the annual sustained yield capacity of the district based solely on the lands that are designated for sustained yield timber

Page 50 - Complaint

management.  The determined and declared ASQ that the O & C Act requires to be sold or offered for sale on a district each year must come entirely from lands that the district's applicable RMP designates as subject to sustained yield timber management.  The BLM is not performing sustained yield management of the lands designated for that purpose as required by the O & C Act unless it offers the entire declared volume of timber sales from lands designated as subject to sustained yield timber management.  The BLM does not consider timber sales from reserves or other areas that are exempt from sustained yield timber management toward achieving the annual ASQ for the district.

119.   The BLM's past, current and likely future failure to sell or offer for sale the ASQ determined and declared in the governing RMPs for each of its O&C districts from lands that are designated in the RMP for sustained yield timber management, constitutes agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. §706(1), and is arbitrary and capricious, an abuse of discretion, not in accordance with law and in excess of statutory authority under 5 U.S.C. §706(2).

PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

1.   A declaration that the BLM's past, current and likely future failure to sell or offer to sell an annual volume of sustained-yield timber sales for each of its six O&C districts (Medford, Roseburg, Coos Bay, Eugene, Klamath Falls and Salem) that is not less than the declared annual allowable sale quantity for each district violates the Oregon and California Railroad and Coos Bay Wagon Road

Page 51 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

Grant Lands Act of 1937 43 U.S.C. §1181a, constitutes agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. §706(1), and is arbitrary and capricious, an abuse of discretion, not in accordance with law and in excess of statutory authority under 5 U.S.C. §706(2).

2. An order directing Defendant Jewell to sell or offer to sell annually an amount of timber for each of the six O&C districts that is not less than the annual allowable sale quantity for the district for fiscal year 2015 and succeeding fiscal years, and for each district to offer an additional quantity of timber divided evenly between fiscal years 2015 and 2016 that is equal to the combined district shortfall from 2004 to 2014.

3. An order requiring Defendant Jewell to sell or offer for sale all of the ASQ determined and declared in the governing resource management plan for each O&C district from lands that are designated in the resource management plan for sustained-yield timber management.

4. A declaration that Defendant Jewell's and Defendant Vilsack's failure to adopt the Owl Estimation Methodology through APA rulemaking procedures violates 5 U.S.C. §553, and that Defendant Jewell's and Defendant Vilsack's violation of 5 U.S.C. §553 is arbitrary and capricious, an abuse of discretion, not in accordance with law and in excess of statutory authority under 5 U.S.C. §706(2).

5. A declaration that the Owl Estimation Methodology is arbitrary and capricious and an abuse of discretion under 5 U.S.C. §706(2) because Defendant Jewell and Defendant Vilsack have not

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347  ●  E-mail: markrutzick@rutzick.com

presented a rational connection between the facts found and the choice made, or provided a rational basis for its adoption.

6.  An order setting aside the Owl Estimation Methodology and prohibiting Defendant Jewell and Defendant Vilsack from using, citing, applying, employing or in any way relying on the Owl Estimation Methodology in or for any decision.

7.  An award of attorneys fees to plaintiff American Forest Resource Council under the Equal Access to Justice Act, 28 U.S.C. §2412.

8.  Granting plaintiffs such further relief as may be just, proper and equitable.

Dated this 31st day of August, 2015.

By: _____/s/_____
Mark C. Rutzick, D.C. Bar No. 979547
markrutzick@rutzick.com
Mark C. Rutzick, Inc.
12402 Myra Virginia Ct.
Oak Hill, VA 20171
Telephone/Facsimile: (703) 870-7347
Attorney for Plaintiffs

Page 53 - Complaint